# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| **FORD GLOBAL TECHNOLOGIES, LLC,** | |
| **Plaintiff,** | Case No. 2:15-cv-10394-LJM-SDD |
| **v.** | |
| **NEW WORLD INTERNATIONAL INC., AUTO LIGHTHOUSE PLUS, LLC, and UNITED COMMERCE CENTERS, INC.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING FUNCTIONALITY AND PATENT EXHAUSTION



## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................1

II.  ORNAMENTALITY.............................................................3

   A.   Design Patent Law.............................................................3

      1.   The Patent and Trademark Office Determined the Patents-In-Suit Are Valid .................................................. 4

      2.   The ITC Already Rejected NWI's Functionality Argument ................................................................. 5

   B.   Application of The Actual Law to The Facts of This Case .................6

      1.   The Exterior Appearance of Ford's Products Were Created by Artists to Look Good, Catch Eyes and Turn Heads........................................................................ 6

         a.   The Ford Design Teams and Process ............................. 7

         b.   The Ford Design Process.................................................. 8

   C.   The Exterior Appearance Claimed in the Patents-in-Suit Was Not Dictated by Any Engineering Or Functional Requirement..........10

      1.   2004 Ford F-150 Truck Designs Originally At Issue................ 11

      2.   2005 Ford Mustang Designs Originally At Issue .................... 15

   D.   The Ornamentation in the Ford Patented Designs is Undisputed .......20

III. PATENT EXHAUSTION IS INAPPLICABLE ...........................................20

   A.   NWI Cannot Claim that Replaced Parts are Repaired When the Parts are Separately Patented .............................................21

   B.   Patent Exhaustion Cannot Be Applied Up the Supply Chain .............22

IV.  CONCLUSION...................................................................24

i



# TABLE OF AUTHORITIES

## Cases

*Aiken v. Manchester Print Works,*
    1 F. Cas. 245, No. 113 (C.C.D.N.H. 1865) (Clifford) ...............................2, 21

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.,*
    2013 WL 5640905 (N.D. Cal. Oct. 11, 2013) ...........................................v, 23

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ............................................................................3

*Crossroads Sys., Inc. v. Dot Hill Sys. Corp.,*
    48 F.Supp.3d 984 (W.D. Tex. 2014) .............................................................23

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,*
    796 F.3d 1312 (Fed. Cir. 2015) ........................................... v, 1, 20

*Helferich Patent Licensing, LLC v. New York Times Co.,*
    778 F.3d 1293 (Fed. Cir. 2015) ........................................... 21, 24

*Hupp v. Siroflex of Am., Inc.,*
    122 F.3d 1456 (Fed. Cir. 1997) ....................................................1, 3

*In re Carletti,*
    328 F.2d 1020 (1964) ..........................................................................3

*Intel Corp v. Broadcom Corp,*
    173 F.Supp.2d 201 (D. Del. 2001) ...........................................v, 23

*JVC Kenwood Corp. v. Nero, Inc.,*
    797 F.3d 1039 (Fed. Cir. 2015) ....................................................23

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
    988 F.2d 1117 (Fed. Cir. 1993) .................................................2, 4

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.,*
    152 U.S. 425 (1894)..........................................................................v, 21



*Rosco Inc. v. Mirror Lite Company*,
    304 F.3d 1373 (Fed. Cir. 2002) ..................................... v, 1, 2, 3, 5, 10, 12, 16

### Statutes

35 U.S.C. § 171 ............................................................... 1, 3, 5, 10, 19, 20
35 U.S.C. § 271 ........................................................................ 20, 22
35 U.S.C. § 282 ...............................................................................4

### Other Authorities

MPEP 1504.1(C) ...............................................................................5



## STATEMENT OF THE ISSUES

1.  Whether summary judgment of ornamentality and lack of functionality is warranted when Defendants have presented only a legally unviable theory of functionality, and Defendants have presented no evidence that would meet the proper test for functionality and in fact admit the central inquiry that alternative designs exist.


2.  Whether summary judgment of no patent exhaustion is warranted when Defendants have presented only a legally unviable theory of exhaustion and Defendants have presented no evidence that would meet the proper test for patent exhaustion.


   **Ford answers <u>Yes</u> to both.**



# KEY AUTHORITY

## ORNAMENTALITY/FUNCTIONALITY

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
796 F.3d 1312, 1329-30 (Fed. Cir. 2015).

*Rosco, Inc. v. Mirror Lite Company*,
304 F.3d 11373 (Fed. Cir. 2002)

## PATENT EXHAUSTION

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.,*
152 U.S. 425, 435 (1894)

*Intel Corp. v. Broadcom Corp.*,
173 F.Supp.2d 201 (D. Del. 2001)

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
2013 WL 5640905 (N.D. Cal. Oct. 11, 2013)



## I.    INTRODUCTION

This motion addresses Defendants' defenses of functionality and patent exhaustion.[1] Defendants' Final Invalidity Contentions on the original seven patents-in-suit demonstrated that Defendants (collectively, "NWI") have offered <u>no</u> viable legal theory and <u>no</u> evidence on these defenses.  (Ex. 1, Final Invalidity Contentions at 17-32.)  Summary judgment is also appropriate at this time because NWI asked this Court to separate these defenses for bifurcated discovery and summary judgment treatment, including an October 2016 deadline for NWI to file a summary judgment motion on these defenses.

***Ornamentality/Functionality.***  NWI claims that the asserted design patents do not comply with 35 U.S.C. § 171 because the claimed designs are not ornamental but instead functional.  NWI cannot meet the strict standard required to prevail on this defense – whereby NWI must show by clear and convincing evidence that there are no other designs that have the same functional capabilities as the claimed designs. *Rosco Inc. v. Mirror Lite Company*, 304 F.3d 1373, 1378-79 (Fed. Cir. 2002).  Indeed, NWI must prove the claimed designs are "dictated by function alone."  *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed. Cir. 1997).  If there are alternative designs that work, that provides dispositive evidence that the ornamentality requirement of 35 U.S.C. § 171 has been satisfied.  *Ethicon Endo-Surgery, Inc. v.*

---

[1] This motion addresses the original seven design patents-in-suit.  It does not address the six additional patents that have been added by amended complaint and are currently subject to a motion to dismiss filed by NWI.  Regardless, the same logic on NWI's aberrant legal position and lack of any proper evidence should make a decision applicable to the added patents as well.



*Covidien, Inc.*, 796 F.3d 1312, 1329-30 (Fed. Cir. 2015)*; L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir. 1993); *Rosco*, 304 F.3d at 1378.

Here, artistic Ford employees created the automotive part designs at issue in this case. Styling is critically important to the automotive industry, and Ford spends millions of dollars supporting artists who create eye-catching designs. NWI has not disputed that the patented parts possess ornamentality that is desirable to consumers. Nor has NWI disputed that alternative parts exist that will fit a vehicle and perform all utility of the original part. The Final Contentions present only an improper legal theory that appearance itself is a function, arguing that the appearance of a component must be matched and copied.[2] Based on the undisputed record, summary judgment of ornamentality is appropriate.

***Patent Exhaustion.*** NWI claims that the doctrine of patent exhaustion gives it *carte blanche* to copy Ford's designs, then import, sell and offer to sell parts that are covered by the patents-in-suit.[3] As explained over 150 years ago: "unfortunately for the defendants in this case, the [component] is subject to a patent, and in making and using it they have infringed the right of the plaintiff." *Aiken v. Manchester Print Works,* 2 Cliff. 435, 1 F. Cas. 245, No. 113 (C.C.D.N.H. 1865) (Clifford). Exhaustion is therefore inapplicable.

---

[2] In the concurrently filed opposition brief in Case No. 15-cv-10137, Ford explained in detail how the contention that all component design patents are functional directly contravenes of existing law.

[3] An NWI email produced in the ABPA case showed the expansiveness of NWI's willful infringement – which was recently discovered to be continuing after assurances that the infringement had ceased. NWI's own analysis of its sales of parts covered by Ford patents showed that infringing sales exceeds $500,000 dollars on 5500+ parts per year. (Ex. 28, Ma Tr. 149:19-150:25.)



NWI positions have no basis in law.  NWI has presented no evidence in its Final Contentions or elsewhere that could meet its burden to establish either defense *under the existing law*.  Summary judgment is appropriate and required at this time.

## II.   ORNAMENTALITY

## A.   Design Patent Law

Under 35 U.S.C. § 171, a design patent is granted for "new, original and ornamental design[s] for an article of manufacture."  A design patent is intended to protect a unique appearance of a functional item.  However, if the design claimed in a design patent is dictated solely by the function of the article of manufacture, the patent is invalid because the design is not ornamental.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989) ("To qualify for protection, a design must present an aesthetically pleasing appearance that is not dictated by function alone, and must satisfy the other criteria of patentability."); *In re Carletti*, 328 F.2d 1020, 1022 (1964) ("[I]t has long been settled that when a configuration is the result of functional considerations only, the resulting design is not patentable as an ornamental design for the simple reason that it is not 'ornamental' — was not created for the purpose of ornamenting.").

Only those designs that completely lack ornamentality are invalid as functional. *Hupp*, 122 F.3d at 1460 ("A design or shape that is entirely functional, **without ornamental or decorative aspect**, does not meet the statutory criteria of a design patent." (emphasis added)).   The Federal Circuit has addressed design patent functionality in the context of auto parts.  In *Rosco*, 304 F.3d at 1378, the Federal Circuit *reversed* a jury verdict of invalidity and held as a matter of law that the design



3

patent illustrated below on cross-view mirrors for use on school buses was *not* invalid based on functionality.  *Id*. at 1379.



In holding the patented design *not* invalid, the Federal Circuit made clear that a design is dictated by function only when it is "the only possible form of the article that could perform its function."  *Id*. at 1378.  The Federal Circuit explained:

> We apply a stringent standard for invalidating a design patent on grounds of functionality: the design of a useful article is deemed functional where "the appearance of the claimed design is 'dictated by' the use or purpose of the article."  *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir. 1993) (citing *In re Carletti,* 328 F.2d 1020, 1022 (CCPA 1964)).  "[T]he design must not be governed solely by function, *i.e.,* that this is not the only possible form of the article that could perform its function."  *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.,* 190 F.3d 1360, 1368 (Fed. Cir. 1999).  "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose."  *L.A. Gear,* 988 F.2d at 1123 (citations omitted).  That is, if other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional. Invalidity of a design patent claim must be established by clear and convincing evidence.

*Id.*

### 1.  The Patent and Trademark Office Determined the Patents-In-Suit Are Valid

The design patents in suit are presumed valid by statute.  35 U.S.C. § 282; *L.A. Gear,* 988 F.2d at 1123.  This lawsuit is not the first time the ornamentality of the patents-in-suit was evaluated.  The Examiners in the Patent and Trademark



Office evaluated each of the asserted design patents and their compliance with 35 U.S.C. § 171 including non-functionality. *See* MPEP 1504.1(C). NWI has not presented any evidence, let alone clear and convincing evidence, that the patent Examiners were wrong. Like the defendant in *Rosco*, NWI has "not shown by clear and convincing evidence that there are no designs, other than the one shown in Rosco's '357 patent, that have the same functional capabilities as Rosco's oval mirror." *Rosco*, 304 F.3d at 1378.

### 2. The ITC Already Rejected NWI's Functionality Argument

In 2006, the International Trade Commission ("ITC") instituted an investigation into the practices of several ABPA members other than NWI. As admitted by NWI, its suppliers (also ABPA members) make exact copies of Ford's patented designs. (Ex. 2, Initial Determination, pp. 174-179.) The ABPA members (and/or those acting in concert) procure Ford parts, send those parts to Taiwan, produce copies through computer scanning, and then import those Ford-copies into the U.S. with minimal concern for quality. (*Id*.) Ford invests in design and styling. ABPA members steal it. In 2006, the ITC flatly rejected the allegation that the exterior design of Ford's products was dictated by function. (Ex. 33, ITC Order No. 12.) The ABPA members appealed numerous rulings of the ITC, but did not dispute the ITC's finding on functionality.



## B.  Application of The Actual Law to The Facts of This Case

### 1.  The Exterior Appearance of Ford's Products Were Created by Artists to Look Good, Catch Eyes and Turn Heads

NWI has admitted that the exterior appearance of Ford vehicles is created by artists for their aesthetic appeal to consumers, *e.g.*: "Ford employed designers trained in the fine arts to create the exterior appearance of the 2004 F-150 hood." (Ex. 3, NWI Response to RFA 21.)  NWI's 30(b)(6) witness Joseph Tsai testified that "the same is true for all the other parts at issue in this case."  (Ex. 4, Tsai 30(b)(6) 01/13/17, 67:2-9.)  NWI also admitted that Ford invests heavily in creating aesthetically pleasing designs so that consumers will want to buy Ford products.

> Q.   Mr. Tsai, as you know, Ford employs a lot of artistic designers; right?
> A.   Yes.
> Q.   Ford spends a lot of money in creating aesthetically pleasing designs of Ford's vehicles; right?
> A.   Yes.
> Q.   And those designs – are created by the sum of its parts, if you will; right?
> A.   Yes.
> Q.   Ford invests in – have you seen automotive clay modeling, where they basically sculpt cars out of clay?   Have you seen that?
> A.   Yes.
> Q.   And you've seen the attention to detail that appears in automotive part designs; right?
> A.   Yes.
> Q.   Ford invests heavily in automotive design because, as you've told me earlier in the deposition, it's because people [will] want to buy Ford products; right?
> A.   Sure.
> Q.   With that large investment, is there any ability of a design patent to protect anything that Ford designers do?
> A.   I don't know.

(Ex. 4, Tsai 30(b)(6), 28:25–29:23; *see also*, 11:19–12:12.)



Unfortunately, even with this large investment and commitment to part design, according to NWI's unviable legal theory, Ford can *never* use the design patent laws to protect its aesthetically innovative designs – because every design patent on a component becomes immediately invalid as soon as Ford uses it on a vehicle.

### a.   The Ford Design Teams and Process

The Ford designers who invented the 2004 F-150 designs are all artists. Patrick Schiavone, Craig Metros and Tyler Blake were schooled in art and design at the College for Creative Studies ("CCS").  (Ex. 5, Schiavone 4/20/06 Dep., 9:4-6; Ex. 6, Metros Dep., 12:19-22; Ex. 7, Nowak Dep., 36:11-41:5.)  CCS is a leading art/design school in the United States, where aspiring artists and lovers of vehicle design flock for training.  (Ex. 7 at 36:11-20, Ex. 8, CarDesignNews.com.)  Each of the inventors received a Bachelor of Fine Arts and worked on designing the aesthetic appearance of automobiles.

The designers who created the designs of the 2005 Ford Mustang (Larry Erickson, J Mays) are also highly-acclaimed artists.  Larry Erickson is now the Chair of Transportation Design at CCS.  (Ex. 8.)  J Mays is probably the most decorated automotive designer in his generation. The Geffen Museum of Contemporary Art in Los Angeles presented an exhibition dedicated to the car designs of J Mays in November of 2002.  An entire book titled, "Retrofuturism: The Car Design of J Mays," showcases the unique artistic talents and accomplishment of J Mays.  J Mays has received numerous awards for his artistic car designs including the Don Kubly Professional Attainment Award from the Art Center College of Design.  (Ex. 9.)



7

The 2005 Ford Mustang is often cited as one of J Mays most consequential vehicle designs. (Ex. 21.)

###### b.    The Ford Design Process

The styling of a car is art, designed to invoke an emotional link with customers to drive sales.  The design process begins with discussions about what imagery or story the vehicle design should tell.  As explained by J Mays:

> Well, the beginning of the design process is figuring out what it is --
> before we get our pencils out and start sketching, we talk about the
> story, about what it is we want to -- what story do we want to tell.  And,
> again, that story was, for the Mustang, rebellion.  A bit like when I was
> describing the Volkswagen as simplicity, this one was about rebellion.

(Ex. 10 at 54:25–55:7.)  Then, the designers begin sketching.  (See, *e.g.*, *Id*. at. 60:14–62:1; Ex. 5 at 20:4-10.)   Sketching allows the designers to express their creativity in their presentation of design themes.  (See, *e.g.*, Ex. 10 at 58:19–59:22, 61:17–62:1; Ex. 11, Rogman Dep. 13:23-14:3; Ex. 5 at 20:4-10.)

After hundreds of sketches are created, evaluated, revised or discarded, some sketches with the aid of computer drafting move into a clay modeling phase.  (See, *e.g.*, Ex. 5 at 39:3–40:22.)

> Q.    So you went from two-dimensional theme sketches to clay
>        models?
> A.    Full size clay models.
> Q.    Does the clay start out as a bog block of clay?
> A.    Yes, it does.
> Q.    And it's sculpted like a sculptor would sculpt?
> A.    Absolutely.  Leonardo Da Vinci would understand what we're
>        doing, if he knew what a car was.

(Ex. 5 at 39:21–40:9; Ex. 10 at 62:5–62:23, 70:20–72:9.)

The sculpting process involves multiple designs that change repeatedly.  The design is refined for purely aesthetic reasons.  As the clay is refined, the designers



focus on the individual part development. (See, *e.g.*, Ex. 12, Gaffka Dep. at 64:13–65:7.)  Engineering does not have involvement with the clays and does not have a say in the aesthetic surfaces claimed in the patents-in-suit.  (See, *e.g.*, Ex. 5, at 47:17-20.)

As explained by Larry Erickson for the 2005 Mustang: "I held final responsibility to okay the final surface" for the appearance of the parts.  (Ex. 3, Erickson dep., 66:21-68:6.)  Craig Metros had a similar role for the 2004 F-150: "As design manager [under Pat Schiavone] I was responsible for the appearance of the exterior . . . And I guess it really means that I'm the one making decisions on what that vehicle's going to look like."  (Ex. 6 at 16:21–17:9.)  All details of the exterior appearance of these vehicles were driven by aesthetics and controlled by Ford's artistic staff.  (See, *e.g.*, Ex. 13, Erickson Decl.  ¶ 6; Ex. 14, Ujkashevic 12/09/08 Dep., 13:9–15:7; Ex. 6, at 16:21–17:10; Ex. 15, Schiavone Decl. ¶ 5; Ex. 16, Ujkashevic 06/20/06 Decl. ¶ 4; Ex. 17, Ujkashevic 01/05/09 Decl. ¶ 4.)

As the creative process for the exterior appearance is concluding, only then is engineering asked to confirm that the aesthetic design is feasible, i.e., that it can be manufactured.  (See, *e.g.*, Ex. 6 at 91:16–92:15; Ex. 5 at 47:17–48:8.)  There were no functional engineering changes to the aesthetic design of the components at issue in this lawsuit.  (See, *e.g.*, Ex. 18, Ujkashevic 06/08/06 Dep., 33:4-34:9; Ex. 15 at ¶ 6; Ex. 17, at ¶ 5; Ex. 13 at ¶ 6-8; Ex. 16 at ¶ 4-5; Ex. 19 Erickson Dep., 68:14–70:6.)  The exterior appearance of these components was decided by the artists.  (See, *e.g.*, Ex. 13 at  ¶ 6-8; Ex. 16, at ¶ 4-5.)  Ford refers to this appearance as the show surface or A-surface.  (Ex. 19 at 82:3-5.)  The aesthetic exterior appearance of these parts are then transferred to the engineering organization to design the back-side or B-



surface to tool parts that fit and function on the vehicle.  (Ex. 14 at 32:17–33:4; 56:10-19.)

Design is a major driver in commercial success in the automotive industry. The Ford F-150 was a momentous commercial success and won numerous prestigious awards – including the 2004 North American Truck of the Year award, 2004 Motor Trend Truck of the Year, and the 2004 Car and Driver Best Pickup Truck.  (Ex. 20.) Like the 2004 F-150, the 2005 Ford Mustang was a break-out commercial success and the recipient of numerous design awards.  (Ex. 21.)

## C.  The Exterior Appearance Claimed in the Patents-in-Suit Was Not Dictated by Any Engineering Or Functional Requirement

Each of the claimed designs has the requisite ornamentality required by 35 U.S.C. § 171 and is not "dictated by function alone."  It is undisputed that Ford designers created each of the claimed designs based on style and ornamentation.  It is also undisputed that other parts are available in the marketplace that perform the same utilitarian functions. This establishes that there are many ways to design grilles, head lamps, etc. for the Ford F-150 and Mustang vehicles.[4]  Thus, as a matter of law, the designs at issue are not "dictated by function alone."  *Rosco*, 304 F.3d at 1378.

The ABPA's own expert confirmed that "performance parts," i.e., parts with a

---

[4] Performance parts can be more expensive than OEM parts and look markedly different to create a custom look.  In fact, the ABPA and NWI recognized the option of selling alternative replacement parts with slight design modifications to avoid the infringement issue. (Ex. 27, Joseph Tsai 06/19/14 Tr., 122:17-123:19.) The cost of designing and tooling their own parts, however, led such plans to be abandoned. (Ex. 28, Ma Tr., 101:8-102:20.)  NWI did not want to commit to purchasing the minimum number of parts to satisfy its suppliers to undertake the cost.  *Id.*  This again shows that alternative parts exist – and the infringement was undertaken only to avoid the cost of obeying the law by designing their own replacement parts.



10

different aesthetic appearance, function on the Ford vehicles.

> Q. If a person comes in and there's an issue with their grille, the insurance company prices it out and there a certain dollar amount that's there, have you ever had a situation where the owner of the vehicle or the person that brought in the vehicle would like it replaced with a different grille?
>
> A. Yes.
>
> Q. And in those instances, your shop put the grille that's requested by the owner on there?
>
> A. Yes.
>
> Q. And would charge the difference or give a refund if it was more?
>
> A. Yes.
>
> Q. And do you understand why certain people ask for different grilles to be put on vehicles?
>
> A. Yes.
>
> Q. Why is that?
>
> A. Performance parts.
>
> Q. They want it to look different?
>
> A. Yes.
>
> Q. Even though the parts look different, it still functions as a grille on the – on the vehicle, though, right?
>
> A. Yes.
>
> * * *
>
> A. I would describe a "performance part" as something that sports it – sports it up.
>
> Q. Makes it look different?
>
> A. Yes.

(Ex. 23, Zimmerman Dep., 36:2-37:10, *see also*, 37:1-38:1; *see also,* Ex. 4 Tsai 30(b)(6) Dep, 9:1-9; Ex. 3, NWI, Resp. to RFA No. 34; Ex. 24, ABPA Resp. to RFA No. 14.)

## 1.    2004 Ford F-150 Truck Designs Originally At Issue

All of the designs for the patents-in-suit were created for aesthetic purposes. Lead designer Patrick Schiavone testified that: "All details of the exterior appearance of the 2004 Ford F-150 truck were created by the design team to be attractive and



aesthetically desirable." (Ex. 15 at ¶5.) And, alternative parts are available for the 2004 Ford F-150 vehicle. Often times, alternative parts appear on different trim levels of Ford's own production vehicles. For example, as illustrated below, the 2004 F-150 vehicle includes four different trim levels, each with a different looking grille.

| Ford-F150 Lariat<br>Asserted US Pat. No. D496,890 | Ford-150 Harley Davidson Edition |
|---|---|
| | |
| Ford-150 XLT<br>U.S. Patent No. D495,979 | Lincoln Mark LT[5] |
| (Ex. 26.) | (Ex. 25, Johnson Decl. ¶4, Ex. B.) |

(Ex. 25, Johnson Decl. ¶3, Ex. A.)

NWI copies only the high-volume parts in order to maximize its profits, but the existence of more than one grille design for the 2004 Ford F-150 vehicle demonstrates that there is not "only [one] possible form of the article that could perform its function." *Rosco*, 304 F.3d at 1378.

Other companies also invest in design and create "performance parts" for the Ford F-150. These parts are designed to fit and function with the Ford F-150 vehicle;

---

[5] The Lincoln Mark LT pick-up truck shares numerous common parts with the 2004-2008 Ford F-150. (Ex. 16, Ujkashevic 06/20/06 Decl. ¶ 8.)



they just have a different ornamental appearance.  (Ex. 16 at ¶9, *see also, e.g.,* Ex. 15 at ¶11; see also, *e.g.*, Ex. 4, 23, 25, 27, 38-45.)   This is the case for all of the design patents at issue.

**U.S. Patent No. D496,890** is directed to a grille.  The claimed design includes surface ornamentation of a vehicle grille and the size, orientation, and placement of an inner and an outer frame with a recessed honeycomb lattice with contours as shown in the patent figures below.

| Figure 1 | Figure 3 |
|---|---|



As evidenced by the unlimited number of vehicle grille designs on the road today, alternative designs could have been employed.  (Ex. 16, Ujkashevic Decl., ¶¶9-10, Ex. C; Ex. 15.) In fact, there are scores of alternative parts that are created for use specifically on the 2004 Ford F-150 vehicle. (Ex. 16 at ¶¶7-8.)  A select few alternative parts are shown below.  (Ex. 25, Johnson 2017 Decl. ¶¶3-6, Exs. A-D; Ex. 16 Ujkashevic 06/20/06 Decl., ¶¶7-10, Exs. A-B.)

| Alternative Grilles |
|---|



(Ex. 25, Johnson Decl., ¶6, Ex. D.)          (Ex. 25, Johnson Decl., ¶5, Ex. C.)



13

**U.S. Patent No. D493,552** is directed to a headlamp.  The claimed design includes the styling of a vehicle headlamp with its placement, size and orientation of dominant and subdominant lamps, a crescent side marker and a cylinder backing with horizontal image lines as shown in the patent figures below.

| Figure 1 | Figure 2 |
|:---:|:---:|
|  | |

As evidenced by the unlimited number of vehicle headlamp designs on the road today, alternative designs could have been employed.  (Ex. 16, Ujkashevic 06/20/06 Decl., ¶¶12-13, Ex. D; Ex. 15.)  In fact, there are scores of alternative parts that are created for use on the 2004 Ford F-150 vehicle.  A select few alternative parts are shown below.  (Ex. 25, Johnson 2017 Decl. ¶¶ 7-8, Exs. E-F; Ex. 16 Ujkashevic 06/20/06 Decl., ¶ 13, Ex. E; Ex 30, Johnson 2006 Decl., ¶ 8, Ex. F.)

| Alternative Headlamps | |
|:---:|:---:|
| (Ex. 25, Johnson Decl., ¶7, Ex. E.) | (Ex. 25, Johnson Decl., ¶8 Ex. F.) |

**U.S. Patent No. D493,753** is directed to a hood design.  The claimed design includes surface ornamentation of a vehicle hood and the size and shape of an



14

enlarging power dome that resolves into a consistent cowl edge as shown in the patent figures below.

| Figure 1 | Figure 4 |
|---|---|
|  | |

As evidenced by the unlimited number of vehicle hoods on the road today, alternative designs could have been employed.  (Ex. 17, Ujkashevic 01/05/09 Decl. ¶¶12-13.)   In fact, there are scores of alternative parts that are created for use specifically on the 2004 Ford F-150 vehicle.  As select few alternative parts are shown below.  (Ex. 25, Johnson 2017 Decl. ¶¶ 9-10, Exs. G-H.)

| Alternative Hoods | |
|---|---|
|  | |
| (Ex. 25, Johnson Decl., ¶9, Ex. G.) | (Ex. 25, Johnson Decl., ¶10 Ex. H.) |

This provides indisputable evidence that the claimed designs from the F-150 components shown in the figures was not dictated by function alone, and therefore, satisfies the ornamentality requirement of 35 U.S.C. § 171.

## 2.   2005 Ford Mustang Designs Originally At Issue

All of the designs for the Mustang patents-in-suit were created for aesthetic purposes. As designer Larry Erickson testified: "All details of the exterior appearance of the 2005 Ford Mustang were created by the design team to be attractive and



15

aesthetically desirable." (Ex. 13 at ¶6.)  Alternative parts are available in the marketplace for the 2005 Ford Mustang vehicle, including different trim levels of Ford's own production vehicles.  For example, the 2005 Ford Mustang vehicle offers at least four hood designs and three bumper designs.  (Ex. 17, Ujkashevic 01/05/09 Decl. ¶7.)  NWI only bothers to copy the high volume V6 and GT designs.



The existence of more than one exterior design for the 2005 Mustang demonstrates that there is not "only [one] possible form of the article that could perform its function." *Rosco*, 304 F.3d at 1378.



**U.S. Patent No. D510,551** is directed to a hood design. The claimed design includes surface ornamentation of a vehicle hood and the size, proportions and dimensions of a long power bulge and stepped transition as well as leading edge overhang as shown in the patent figures below.

| Figure 2 | Figure 3 |
|----------|----------|
|  | |

As evidenced by the unlimited number of vehicle hood designs on the road today, alternative designs could have been employed. (Ex. 17, Ujkashevic 01/05/09 Decl. ¶¶12-13.) In fact, there are scores of alternative parts that are created for use specifically on the 2004 Ford F-150 vehicle. As select few alternative parts are shown below. (*Id. at* ¶11; Ex. 31, Leshan 2009 Decl. ¶¶22-24, Exs. 15-16; Ex. 25, Johnson 2017 Decl. ¶¶20-21, Exs. R-S.)

| Alternative Hoods | |
|-------------------|---|
|  | |
| (Ex. 25, Johnson Decl., ¶20, Ex. R.) | (Ex. 25, Johnson Decl., ¶21 Ex. S.) |

**U.S. Patent No. D539, 448** is directed to a vehicle tail lamp. The claimed design includes surface ornamentation and the size, orientation and placement of



three reflectors including a recessed frame of defined proportion as shown in the patent figures below.

| Figure 3 | Figure 4 |
|---|---|
|  | |

As evidenced by the unlimited number of vehicle tail lamp designs on the road today, alternative designs could have been employed. (Ex. 17, Ujkashevic 01/05/09 Decl. ¶¶22-23.) In fact, there are scores of alternative parts that are created for use specifically on the 2005 Ford Mustang vehicle. As select few alternative parts are shown below. (*Id.*at 23; Ex. 25, Johnson 2017 Decl. ¶¶26-27, Exs. X-Y.)

| Alternative Tail Lamps | |
|---|---|
|  | |
| (Ex. 25, Johnson Decl., ¶26, Ex. X.) | (Ex. 25, Johnson Decl., ¶27 Ex. Y.) |

**U.S. Patent No. D498,444** and **U.S. Patent No. D501,162** are each directed to a front bumper design. The '444 design includes the size and placement of various character lines and ridges as well as a curved lower body as shown in the patent figures below on the left. The '162 design includes a sharp and defined lower edge



18

in addition to size and placement of character lines and ridges.  The '444 and '162 designs are shown in the patent figures below.



| D498444 - Figure 3 | D498444 - Figure 4 |
| D501162 - Figure 3 | D501162 - Figure 4 |

As evidenced by the unlimited number of vehicle bumper designs on the road today, alternative designs could have been employed.  (Ex. 17, Ujkashevic 01/05/09 Decl.  ¶7-9.)  In fact, there are scores of alternative parts that are created for use specifically on the 2005 Ford Mustang vehicle.  As select few alternative parts are shown below.  (*Id.*at 7-8; Ex. 25, Johnson 2017 Decl. ¶¶16-17, Exs. N-O.)

**Alternative Front Bumpers**



| (Ex. 25, Johnson Decl., ¶16, Ex. N.) | (Ex. 25, Johnson Decl., ¶17 Ex. O.) |

This provides indisputable evidence that the claimed designs from the Ford Mustang components shown in the patent figures was not dictated by function alone, and therefore, satisfies the ornamentality requirement of 35 U.S.C. § 171.



## D.    The Ornamentation in the Ford Patented Designs is Undisputed

NWI does not dispute ornamentation inherent in the designs, and has not presented any patent-specific evidence of functionality as required under the law. *Ethicon*, 796 F.3d at 1332.  The undisputed record that ornamentation was the driving force for the designs of the patents-in-suit, demonstrates compliance with 35 U.S.C. § 171.  As further evidence of the undisputed ornamentality, Ford could have employed a virtually unlimited number of alternative designs.  This is evident from the numerous *existing* alternative parts that can be used in the place of the parts having Ford's patented design – the only difference is that they have a different ornamental appearance.  The record evidence conclusively demonstrates compliance with 35 U.S.C. § 171.

Given this undisputed evidence and ***the failure for NWI to identify any functionality defense*** in its Final Contentions (other than its appearance as function change in the law), summary judgment is appropriate.

### III.    PATENT EXHAUSTION IS INAPPLICABLE

35 U.S.C. § 271(a) states: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  NWI cannot copy Ford's designs, then import, sell and offer to sell new parts that are covered by the patents-in-suit.  These facts are undisputed.  (Ex. 23, Zimmerman at 59:14-60:24; Ex. 4, Tsai 30(b)(6) Dep., 98:19-22.)  These actions are all infringements and not related to any sale by Ford.



## A.    NWI Cannot Claim that Replaced Parts are Repaired When the Parts are Separately Patented

The Supreme Court settled long ago that the sale of an article does not confer upon the purchaser a right to replace a component of that article *when that component is separately patented*. *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.,* 152 U.S. 425, 435 (1894) (discussing *Aiken*). In *Aiken*, the defendant purchased a knitting machine and needles from the patentee and may "repair the needles they purchased, but they cannot manufacture new [needles]" as "the needle is subject to a patent, and in making and using it they have infringed the right of the plaintiff." 1 F. Cas. 245, No. 113 (C.C.D.N.H. 1865) (Clifford). The law is well-settled: the purchase of a Ford F-150 does not confer upon its purchaser a right to replace a separately patented component. *See also, Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1303-04 (2015). A purchaser is entitled to repair, but not replace entirely, a patented component.

Patent rights are exhausted only for the specific product actually sold. There is no exhaustion as to any other product, and certainly not to products made and sold by New World. NWI's infringing products do not contain a single molecule from the original Ford part sold. (Ex. 24, ABPA Resp. to RFA 21.) In addition, the repair/reconstruction doctrine focuses on the scope of the claim asserted, as recognized by the ABPA. (Dkt. 39 at 23: "[If] the needles are being replaced [then the] patent infringement of the needle patent may exist and the affirmative defense of patent exhaustion is not available.") If a claim of an asserted patent covers a



21

headlamp, the focus is on whether the headlamp is repaired or replaced.  Here, NWI does not repair headlamps, it sells replacement[6] headlamps: that is an infringement.

## B.      Patent Exhaustion Cannot Be Applied Up the Supply Chain

NWI's exhaustion theory asserts purchasers of Ford vehicles can "repair" their vehicle, even if that "repair" is in fact replacing a separately patented part.  As described above, Supreme Court precedent rejects NWI's theory.  But, even if one ignores precedent and assumes that patent exhaustion allows vehicle purchasers to replace patented components, NWI still has no defense because *NWI did not purchase the Ford vehicles being repaired.*  When NWI imports, offers for sale and/or sells patented Ford parts, those acts constitute infringement pursuant to 35 U.S.C. § 271.  Even if an NWI customer was authorized to replace a patented Ford part, that would not insulate NWI from infringement.   FGTL is not aware of any case where patent exhaustion doctrine was applied upstream to protect an infringer like New World.[7]  There has never been a single case in which patent exhaustion excused past infringing activity *ex post facto* because the infringer sold the infringing parts to an allegedly authorized customer in downstream commerce.  Not one of the cases cited by NWI or the ABPA applied exhaustion upstream, as NWI proposes. Indeed, no court "has ever applied the patent exhaustion doctrine to protect anyone

---

[6] Many companies focus on repairing original (*e.g.,* Ford) vehicle parts for re-use, such as bumpers and grilles.  That type of repair business provides an alternative source of vehicle component parts that Ford patents do not cover if there is mere repair. (Ex. 29, Salamy Dep., 116:9-119:14.)

[7] In the concurrently filed opposition brief in Case No. 15-cv-10137, Ford explained in detail how NWI's legal position contradicts existing law.



'upstream' – e.g., the person/entity's suppliers." *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, 2013 WL 5640905 at *2 (N.D. Cal. Oct. 11, 2013). Exhaustion never excuses past infringement. *Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*, 48 F.Supp.3d 984, 990–91 (W.D. Tex. 2014) (citing *Global Comms., Inc. v. DirecTV, Inc.*, 1 F.Supp.3d 1305, 1307–08 (N.D. Fla. 2014).

New World is selling off the shelf products, with no prior contact with an authorized entity prior to committing infringement. This was explained as improper in *Intel Corp. v. Broadcom Corp.*, 173 F.Supp.2d 201 (D. Del. 2001), though it involved a license issue, rather than a first sale issue: "Subsequent sales of [] off-the-shelf products to licensees do not convert that act of infringement into noninfringement." An actual licensee may "request a third party to make the product for it" but a licensee has no ability to "immunize prior acts of infringement through its subsequent purchase of off-the-shelf goods." *Id.* A third party's acts are only noninfringing if "there is a flow of rights that authorizes the unlicensed party's otherwise infringing acts (i.e. making, selling, or using the patented invention)" that flow "down to the third party manufacturer before the third party engages in any of those otherwise infringing acts." *Id.* A defendant "cannot unilaterally rely on the rights of the licensees who purchase its products" if any such rights have not been conferred onto the defendant. *Id.*

NWI has not provided any evidence of authorization from a licensee to NWI in advance of any infringement. *See, JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1046–47 (Fed. Cir. 2015) (finding "the threshold criterion" for exhaustion "is that the product whose sale is suggested to exhaust the patent must have originated



from or through the patentee" and "the record of this case does not so establish"). New World generally has no relationship with the ultimate consumer and sells primarily to body shops and does not obtain any evidence of authorization prior to a sale. (Ex. 24, ABPA Resp. to RFA No. 19.) "Exhaustion is triggered by authorized transfers of title in the property at issue," which fits the doctrine's limited role to date: ensuring the continued absence of certain legal restrictions on the rights of the transferee (and successors) in the acquired item*." Helferich*, 778 F.3d at 1305–06 (Fed. Cir. 2015).   NWI cannot make any claim to be a transferee of rights or a successor thereto.

## IV.   CONCLUSION

For the foregoing reasons, Ford Global respectfully requests that the Court grant its motion for summary judgment on Defendants' defenses of functionality and patent exhaustion for at least the original seven patents at issue as discussed herein.

Respectfully submitted,
**BROOKS KUSHMAN P.C.**

Dated: February 2, 2017

  /s/  Marc Lorelli
Marc Lorelli (P63156)
Frank A. Angileri (P45611)
Linda D. Mettes (P69182)
Amy C. Leshan (P69328)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel:  (248) 358-4400 / Fax:  (248) 358-3351
Email:  mlorelli@brookskushman.com
     fangileri@brookskushman.com
     lmettes@brookskushman.com
     aleshan@brookskushman.com
*Attorneys for Plaintiff*
*Ford Global Technologies LLC*



## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on February 2, 2017, I electronically filed the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING FUNCTIONALITY AND PATENT EXHAUSTION with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing: Robert Oake, Jr. and Thomas G. Cardelli.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System:  None.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

 /s/ Marc Lorelli
Marc Lorelli (P63156)
Frank A. Angileri (P45611)
Linda D. Mettes (P69182)
Amy C. Leshan (P69328)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel:  (248) 358-4400 / Fax:  (248) 358-3351
Email:  mlorelli@brookskushman.com
    fangileri@brookskushman.com
    lmettes@brookskushman.com
    aleshan@brookskushman.com

*Attorneys for Plaintiff*
*Ford Global Technologies LLC*



1