UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

FORD GLOBAL TECHNOLOGIES, LLC,                Hon.  Laurie J. Michelson
                      Plaintiff,              Case No.:2:15-cv-10394-LJM-MJH

v

NEW WORLD INTERNATIONAL, INC.,
AUTO LIGHTHOUSE PLUS, LLC and
UNITED COMMERCE CENTERS, INC.,
                      Defendants.

Marc Lorelli (P63156)                    Robert G. Oake, Jr.
Linda D. Mettes (P69182)                 Texas State Bar No. 15154300
Amy C. Leshan (P69328)                   Oake Law Office
BROOKS KUSHMAN P.C.                       825 Market Street, Suite 250
1000 Town Center, Twenty-Second Floor     Allen, Texas 75013
Southfield, MI  48075                    (214) 207-9066
(248) 358-4400/FAX (248) 358-3351        rgo@oake.com
mlorelli@brookskushman.com

                                         Thomas G. Cardelli (P31728)
Attorneys for Plaintiff                  Paul M. Kittinger (P72754)
                                         CARDELLI LANFEAR, P.C.
                                         322 W. Lincoln
                                         Royal Oak, MI 48067
                                         (248) 544-1100
                                         pkittinger@cardellilaw.com

                                         Attorneys for Defendants

## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING FUNCTIONALITY AND PATENT EXHAUSTION

March 3, 2017

TABLE OF CONTENTS

Page

Table of Authorities   …………………………………….   iii

1.   Statement of Issues to be Decided by the Court   …………….   1

2.   Counter-Statement of Material Facts   ………………………….   1

3.   Response to FGTL Argument on Functionality   …………….   4

   A.   FGTL Fails to Discuss or Even Cite *Best Lock* and
        *Static Control*   ……………………………………   4

   B.   A Design Must be a Matter of Concern to a Purchaser   …   6

   C.   A Design May Not be a Matter of Concern in Three
        Different Ways   ……………………………………   7

   D.   The Claimed Designs are Not a Matter of Concern for
        Two Reasons   ……………………………………   9

   E.   Policy Reasons Support Invalidating the Subject
        Design Patents   ……………………………………   11

   F.   FGTL's Argument Already has been Rejected by the
        Federal Circuit   ……………………………………   12

   G.   *Rosco* and *Ethicon* Do Not Factually Apply to the
        Instant Case   ……………………………………   15

   H.   The ALJ Order No. 12 is Neither Controlling nor
        Correct   ……………………………………   16

4.   Response to FGTL Argument on Patent Exhaustion   ……..   16

   A.   FGTL's Legal Analysis is Incorrect   …………………...   16

   B.   Patent Exhaustion Exists in This Case …………………...   17

C.    The ITC Order 7 is neither Controlling nor Correct …….        19

1.    Patent Exhaustion and Permissible Repair   ……………...        20

2.    The "have made" rights of Vehicle purchasers protect
      the manufacturer of repair parts and others in the
      distribution chain   …………………………………………        23

D.    Defendants have Provided Evidence of
      Patent Exhaustion …………………………………………        24

5.    Conclusion  …………………………………………………        25

TABLE OF AUTHORITIES

CASES                                                           Page(s)

*Aiken v. Manchester Print Works*,
    1 F. Cas 245 (1865)        …………………………..   21, 22, 23

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
    2013 WL 5640905 (N.D. Cal. Oct. 11, 2013)  ………   24

*Best Lock Corp. v. Ilco Unican Corp.*,
    94 F.3d 1563 (Fed Cir. 1996)   ………………………   4, 6, 7, 12, 13, 14

*Best Lock Corp. v. Ilco Unican Corp.*,
    896 F. Supp. 836 (S.D. Ind., 1995)    ………………   6

*CoreBrace LLC v. Star Seismic LLC*,
    566 F.3d 1069 (Fed. Cir. 2009)        ………………   19, 24

*Deere & Co. v. Farmhand, Inc.*,
    560 F. Supp. 85 (SD Iowa 1982), aff'd,
    721 F.2d 253 (8th Cir. 1983)   ………………………   11

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
    796 F.3d 1312 (Fed. Cir. 2015) ………………………   5, 8, 9, 15, 16

*Gorham v. White*,
    81 U.S. 511 (1871)        ………………………………   5, 6, 9

*In re Certain Automotive Parts*,
    337-TA-557ITC   …………………………………………   19

*In re Stevens*,
    173 F.2d 1015 (C.C.P.A. 1949) ………………………   8

*In re Webb*,
    916 F.2d 1553 (Fed. Cir. 1990) ………………………   7

*In re Zahn*,
    617 F.2d 261 (C.C.P.A. 1980)  ………………………   19, 20

*Intel Corp. v. Broadcom Corp.,*
    173 F. Supp. 2d 201 (D. Del. 2001)   ……………   19, 24

*Jazz Photo Corp. v. Int'l Trade Comm.,*
    264 F.3d 1094 (Fed. Cir. 2001) ……………………..   17, 18, 20

*Keene v. Paraflex Industries, Inc.,*
    653 F.2d 822 (3rd Cir. 1981)   ……………………...   11

*Kendall Co. v. Progressive Medical Technology, Inc.,*
    85 F.3d 1570 (Fed. Cir. 1996)   ………………………   18

*Keystone Retaining Wall Systems, Inc. v. Westrock, Inc.,*
    997 F.2d 1444 (Fed. Cir. 1993)   ………………   6

*Kirtsaeng v. Wiley,*
    133 S. Ct. 1351 (2013)   ………………………….   12

*McCoy v. Mitsuboshi Cutlery, Inc.,*
    67 F.3d 917 (Fed. Cir. 1995)   ………………………   18

*Powertech Technology Inc. v. Tessera, Inc.,*
    660 F.3d 1301 (Fed. Cir. 2011) ………………………   19

*Qualitex v. Jacobson Products,*
    514 U.S. 159 (1995)   …………………………..   11

*Quanta Computer Inc. v. Lg Electronics, Inc.,*
    553 U.S. 617 (2008)   …………………………..   17

*Rosco, Inc. v. Mirror Lite Company,*
    304 F.3d 11373 (Fed. Cir. 2002)   ………………   5, 9, 15

*Static Control Components v. Lexmark International,*
    697 F.3d 387 (6th Cir. 2012)   ………………………   4, 6, 7, 12, 14

*Static Control Components v. Lexmark Intern.,*
    487 F.Supp.2d 830 (E.D. Ky., 2007)   ………………   8, 21

STATUTES

35 U.S.C. § 101     ………………………………………     19

35 U.S.C. § 171     ………………………………………     1, 19, 20

Defendants New World International, Inc., Auto Lighthouse Plus, LLC, and United Commerce Centers, Inc. (Defendants) file this response to the Motion for Summary Judgment of Ford Global Technologies, LLC (FGTL) (Doc. 99), respectfully showing as follows:

1.     STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

A.     Whether Design Patents D496,890, D493,552, D493,753, D510,551, D539,448, D498,444 and D 501,162 (Subject Design Patents) are invalid under 35 U.S.C. § 171 because the claimed designs are functional and not ornamental.  YES.

B.     Whether the Subject Design Patents are unenforceable under the patent exhaustion doctrine and associated doctrines of repair and implied license.  YES.

2.     COUNTER-STATEMENT OF MATERIAL FACTS (CSMF)[1]

1.     Ford Motor Company (hereinafter "Ford") is a manufacturer and seller of, *inter alia*, automobiles and automotive parts. (Ex. 1, ¶17). Ford designed,

---

[1]     The Scheduling Order in this case (Doc. 76, ¶6.2(a)) states "[a] summary judgment motion filed in this Court must begin with a "Statement of Material Facts" and "[t]he Statement must identify the facts as to which the moving party contends there is no genuine dispute and that entitle the moving party to judgment as a matter of law." [citation omitted]. The Order also states "[e]ach fact must be briefly and directly stated in a separate numbered paragraph, with citations to specific supporting evidence."  FGTL did not provide a "Statement of Material Facts" with its Motion so Defendants have nothing to respond to as required by Doc. 76, ¶6.2(b). Although FGTL set forth some facts in a narrative form in section 2B of its brief, the Scheduling Order ¶6.2(d) states "[n]o separate narrative facts section will be permitted." Defendants object to FGTL's narrative facts section because it does not comply with the Scheduling Order and if permitted, would place Defendants in a material disadvantage when responding.

1

manufactured, and sold the F-150 Pickup Truck and Ford Mustang (Vehicles) in the United States.  (Ex. 2, 3).[2]

2.      Ford Global Technologies LLC (FGTL) is a subsidiary of Ford Motor Company.  FGTL owns and manages the intellectual property of Ford.  (Ex. 1; ¶18).

3.      FGTL is the owner of United States Design Patent D493,552 (Ex. 11), D496,890 (Ex. 12), D493,753 (Ex. 13), D498,444 (Ex. 14), D501,162 (Ex. 15), D510,551 (Ex. 16), and D539,448 (Ex. 17).

4.      The design decisions that go into making a Ford F-150 Truck and Ford Mustang are all completed before they are manufactured and purchased.

5.      Once the parts with the subject claimed designs are designed for installation on the original vehicle, no additional design work is needed to design repair parts.

6.      F-150 Trucks and Ford Mustangs sometimes are involved in collisions and need repair.  (Ex. 7, p. 1, ¶5).

7.      It is important and necessary to match the appearance of the repair part with the original pre-collision part on the vehicle so that the vehicle is returned back to its original condition and appearance.  (Ex. 6, pp. 2, 3).

_____

[2]      The Scheduling Order (Doc. 76, ¶6.2(b)) states "[t]he Counter-Statement may also contain any additional facts that require the denial of summary judgment, briefly and directly stated in a separately numbered paragraph, with citations to specific supporting evidence.  Defendants are stating such facts in their Counter-Statement of Material Facts.

8.      The only role that design plays in an owner's decision to buy such a part is that the design must match the design of the original part to return the vehicle back to its original condition and appearance.  (Ex. 6, pp. 2, 3).

9.      Vehicle repair parts such as a Ford F-150 hood and head lamp ultimately are sold to, and the repairs are performed on behalf of, the owner of the Ford vehicle being repaired. (Ex. 6, p. 1).

10.     ABPA is a non-profit corporation organized and existing under the laws of the State of Texas with a principal office in Houston, Texas. ABPA members, including New World International, Inc. (New World) distribute aftermarket repair parts in the automotive collision repair trade.  (Ex. 7, p. 1, ¶3).

11.     New World purchases repair parts from a manufacturer or distributor and then sells it to a person or entity needing the parts for repair of the Ford F-150 or Mustang.  (Ex. 7, p. 1, ¶6).

12.     The person or entity purchasing the repair part from New World may be, for example, the owner of the vehicle or a repair facility.  (Ex. 7, pp. 1, 2, ¶6).

13.     The repair parts are always sold for the purpose of repairing the vehicles and are never sold for any other purpose.  (Ex. 7, p. 2, ¶6).

14.     The repair parts are not sold to reconstruct an essentially new vehicle. Rather, the repair parts are sold to repair a vehicle.  (Ex. 7, p. 2, ¶7).

15.     If damage to a F-150 Truck, Mustang, or other vehicle is so extensive that essentially a new vehicle has to be reconstructed, the vehicle will not be repaired.  That is because the cost of the reconstruction will greatly exceed the cost of purchasing another F-150 Truck, Mustang, or other vehicle. (Ex. 7, p. 2, ¶7).

16.     Pursuant to LR 7.1 (g), Defendants state that discovery is ongoing, FGTL is continuing to produce documents, and Defendants believe it may likely be necessary to file additional documents.  Defendants reserve the right to do so.

3.     RESPONSE TO FGTL ARGUMENT ON FUNCTIONALITY

FGTL's argument that the Subject Design Patents are not invalid as functional is not correct.  FGTL's argument fails to consider important design patent legal principles that *must* be considered when analyzing a design for repair/replacement articles that "mate and match" with other articles.   When these principles are properly considered and applied, it becomes clear that the Subject Design Patents are functional and invalid.[3]

A.     FGTL Fails to Discuss or Even Cite *Best Lock* and *Static Control*

FGTL fails to discuss or even cite the two leading design patent cases involving "mate and match" principles:  *Best Lock Corp. v. Ilco Unican Corp*., 94 F.3d 1563 (Fed. Cir. 1996) (involving a key blade design), and *Static Control*

---

[3]     General legal principles related to ornamentality and functionality were set forth on pages 3-6 of ABPA's Motion for Summary Judgment (Doc. 39) in case 2:15cv10137 (hereafter referred to as ABPA Motion).

4

*Components v. Lexmark International*, 697 F.3d 387 (6th Cir. 2012) (involving a toner cartridge for a printer). In both cases, the court found the claimed designs to be invalid as functional. In *Best Lock*, as explained below, the Federal Circuit considered and rejected the same type argument now being made by FGTL.

Rather than discuss *Best Lock* and *Static Control*, FGTL cites and discusses two cases that do not involve mate and match principles and that are not factually relevant to the instant case. These cases are *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312 (Fed. Cir. 2015) and *Rosco, Inc. v. Mirror Lite Company*, 304 F.3d 11373 (Fed. Cir. 2002).

To understand why the design patents in *Best Lock* and *Static Control* were invalidated as functional, and to understand why the Subject Design Patents are invalid for similar reasons, it is helpful to begin with *Gorham v. White*, 81 U.S. 511 (1871), a seminal case in design patent law. In *Gorham*, the Supreme Court explained the underlying rationale for design patents and how it is related to an article's "salable value" and market demand. The Court stated "[t]he acts of Congress which authorize the grant of patents for designs were plainly intended to give encouragement to the decorative arts" and "[t]he law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public." *Id.* at 524, 525. The concepts of "salable value" and market

5

demand necessarily involve a potential article *purchaser* who may be motivated to purchase the article of manufacture based on the claimed design.[4]

B.     A Design Must be a Matter of Concern to a Purchaser

Both *Best Lock* and *Static Control* recognize at the district court and appellate levels the role of the purchaser when determining whether a design is invalid as functional.  In *Best Lock Corp. v. Ilco Unican Corp.*, 896 F. Supp. 836 (S.D. Ind., 1995), the district court stated "[t]he issue becomes one of whether the design is ornamental or non-ornamental, and whether or not a design is ornamental is determined by whether or not the design is a matter of concern to a purchaser, that is, whether there is an aesthetic quality to the design which is a matter of concern to a purchaser." *Id.* at 843. (citing *Keystone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993)).  The court stated further "[t]he assertion that the key end or the keyway might be attractive to the designer or might even be attractive to the casual observer does not overcome the testimony that the design is not a matter of concern during the purchase and use of this product." *Id.*

Similarly, in *Static Control*, the court stated "[t]heir [the cartridges'] design is dictated solely by the printer with which they are compatible" and "[t]he cartridges' appearance had no other role in the purchaser's decision of which cartridge to

---

[4]     The "ordinary observer" test from *Gorham* uses the phrase "giving such attention as a *purchaser* usually gives."  *Id.* at 528. (emphasis added).

purchase." 697 F.3d at 422.  The court quoted with approval the district court's statements that "the appearance of Lexmark's printer cartridges in question are [sic] of no matter of concern during those cartridges' entire existence," "[a]nd even though the cartridges may be seen at some point during their lifetime, at no point was their appearance a matter of concern to the end-user." *Id.*

C.     A Design May Not be a Matter of Concern in Three Different Ways

*Best Lock* and *Static Control* explain that a design may not be a "matter of concern" to a purchaser in three different ways.  First, when the design is not visible during its useful and intended life.  In *Static Control* the court explained "[a]n article is less likely to be ornamental if it is not observed, and the Federal Circuit looks not just to whether the article is ever seen but whether the *appearance* of the article may become a "matter of concern" at any point during the article's "normal and intended use." 697 F.3d at 421. (citing and quoting *In re Webb*, 916 F.2d 1553, 1558 (Fed. Cir. 1990).  Importantly, as noted below in *Static Control*, this factor is distinct from the "dictated by function" factor, because even if a design is not dictated by function, it still can be functional if it is not observed during its useful and intended life.

Second, appearance may not be a matter of concern when the purchaser is repairing or replacing a lost, depleted, or damaged article and where the repair/ replacement article is selected based on compatibility with another article independent of its appearance.  In *Static Control* the court stated "[t]heir design is

7

dictated solely by the printer with which they are compatible[,]" "Lexmark itself explained that the advertisements containing photographs were primarily to assist the customer in selecting the cartridge that was compatible with the printer they owned[,]" and "[t]he cartridges' appearance had no other role in the purchaser's decision of which cartridge to purchase." 697 F.3d at 421. The district court in *Static Control Components v. Lexmark Intern.*, 487 F.Supp.2d 830, 839 (E.D. Ky., 2007) quoted *In re Webb, supra*, as follows:

> It is possible; as in *Stevens*, that although an article may be sold as a replacement item, its appearance might not be of any concern to the purchaser during the process of sale. Indeed, many replacement items, including vacuum cleaner brushes, are sold by replacement or order number, or they are noticed during sale only to assess functionality. In such circumstances, the PTO may properly conclude that an application provides no evidence that there is a period in the commercial life of a particular design when its ornamentality may be a matter of concern.

*Id.* at 1558 (referencing *In re Stevens*, 173 F.2d 1015 (C.C.P.A. 1949). This factor is also distinct from the "dictated by function" factor, as noted below.

Third, appearance may not be a "matter of concern" when a design is dictated by the function it performs. Importantly, the "dictated by function" factor is a "similar, though distinct" requirement.[5]  *See Static Control, supra*, 487 F. Supp. at

---

[5]     The Federal Circuit has not mandated applying any particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,* 796 F.3d 1312, 1329 (Fed. Cir. 2015).

840 ("A similar, though distinct, requirement to a patentable design being a matter of concern at some point is that a patentable design cannot be dictated by functionality.").   The "dictated by function" factor is the only factor focused on by FGTL and the two cases it cites, *Ethicon* and *Rosco* (discussed below).

All three of the above factors (not observed by purchaser/user, purchased for reasons of mate and match compatibility in a repair/replacement, or dictated by function) can, either individually or collectively, render a design patent invalid as functional because they all relate to whether the appearance is a "matter of concern" to the purchaser.   That is, when the appearance is not a "matter of concern" to the purchaser, then saleable value and market demand for the article is not driven by the article's design appearance, and under the principles and policies of *Gorham,* the grant of a design patent does not encourage the decorate arts and is improper.

D.     The Claimed Designs are Not a Matter of Concern for Two Reasons

Applying the "matter of concern" analysis to the instant case, it is clear that the appearance of the Subject Design Patents is not a matter of concern for two reasons.   First, the only reason a purchaser buys parts with the claimed designs apart from when they are purchased as an integrated part of an entire vehicle is when the parts are being purchased for repair/replacement to repair a damaged vehicle. (CSMF 13; Ex. 7, p. 2, ¶6). There is no other reason to purchase parts with the claimed designs. *Id.*  When the purchase is made, the appearance is not a matter of

9

concern because the purchaser only wants a part that will return the damaged vehicle back to its original condition and appearance.  (CSMF 7, 8; Ex. 6, pp. 2, 3).

The second reason that appearance of the claimed designs is not a matter of concern is that the appearance of the parts is dictated by function.  The claimed designs are designed to fit into or onto the Vehicles.  The claimed designs are sold with the parent article and typically may need repair during the useful life of the parent vehicle due to foreseeable collision damage.  (CSMF 6; Ex. 7, p. 1, ¶5).  The appearance of the claimed designs is dictated by their need to mate with and match the appearance of the Vehicles due to functional necessity, aesthetic functionality, and other requirements.  (Ex. 6, pp. 2, 3).  The claimed designs are surrounded by or attached to other portions of the Vehicles and must have a certain appearance to mate and match properly with the surrounding parts.  *Id.*  The appearance of the claimed designs has no other role in the purchaser's decision to buy them other than to be compatible in terms of fit and appearance with the Vehicles that they are being used to repair.  (CSMF 7, 8; Ex. 6, pp. 2, 3).

FGTL's argument that appearance compatibility should not be considered a "function" because it is not mechanical in nature is not persuasive for two reasons. First, as explained in the case law discussed above, an important underlying principle in a functionality analysis is whether the appearance is a "matter of concern" to the purchaser.  As long as a function results in appearance not being a matter of concern,

it should make no difference if the function arises from mechanical function or from appearance compatibility function.

Second, the concept that appearance compatibility can be considered a function already is accepted in trademark law as "aesthetic functionality." In *Qualitex v. Jacobson Products*, 514 U.S. 159 (1995), the Supreme Court indicated that the appearance of a design can be a factor in a functionality analysis in a trademark case. In *Deere & Co. v. Farmhand, Inc*., 560 F. Supp. 85, 98 (SD Iowa 1982), aff'd, 721 F.2d 253 (8th Cir. 1983), a case cited in *Qualitex*, the defendant argued that the color green was aesthetically functional because farmers preferred to match the color of their loaders to that of their tractors. The court agreed with the defendant under reasoning found in *Keene v. Paraflex Industries, Inc*., 653 F.2d 822 (3rd Cir. 1981) where a "wall cube" device was found to be aesthetically functional due to the need for architectural compatibility.

E.    Policy Reasons Support Invalidating the Subject Design Patents

The grant of separate design patents on portions of the repair parts would do nothing to promote the decorative arts. The designs already are part of an overall integrated vehicle design, and the saleable value and market demand of the vehicle results from its overall appearance and not by considering the design of each component individually. Designers like Ford seek design patents on components

11

parts that will foreseeably need repair or replacement to control the market.[6]  That is

not a legitimate reason to grant a design patent.[7]  Indeed, as indicated by the holdings

in *Best Lock* and *Static Control*, the courts interpret design patent law in a way that

prevents this result from occurring.  This court should as well.[8]

      F.     FGTL's Argument Already has been Rejected by the Federal Circuit

      FGTL argues that "[a]s further evidence of the undisputed ornamentality, Ford

could have employed a virtually unlimited number of alternative designs."  FGTL's

argument is that this Court should not focus on the mate and match compatibility of

---

[6]     For example, in *Best Lock*, the court stated "[b]y obtaining patent protection, a company hopes to control the market for duplicate key blanks during the life of the patent."  94 F.3d at 1564.  The patent was held invalid for functionality.

[7]     The higher price commanded by the repair part patentee is more in the nature of a double recovery.  The purchaser pays twice for the same design - once when the car is purchased, and then again when the car is repaired.  *See also* discussion of policy considerations contained on pages 9, 10 of ABPA Motion.

[8]     In addition to application of case law and other legal principles, courts may look to practical problems when deciding issues involving intellectual property law. For example, in *Kirtsaeng v. Wiley*, 133 S. Ct. 1351 (2013) the Supreme Court dealt with the issue of international copyright exhaustion.  In deciding that the "first sale" doctrine applies to copies of a copyrighted work lawfully made abroad, the Supreme Court considered the practical problems of a contrary holding.  Similarly, this court should consider the practical problem that would arise if design patents on automotive repair parts are not held invalid.  If such patents are valid, then FGTL can exclude everyone from making, selling, and using the repair part.  Once a vehicle is damaged, FGTL can prevent an owner from restoring the vehicle back to its original condition except through the use of salvage or repaired parts (that have limited availability).  In that event, if an owner wants an original design, then the owner has to purchase a new vehicle.  FGTL will in effect be able to use the design patent on one repair part to cover the entire vehicle, which would improperly expand the scope of the design patent.

the patented designs with the vehicle after the vehicle and its parts have been

designed, but rather should focus on the period of time before and during the design

process.[9]   The problem with FGTL's argument is that it has already been considered

and rejected by the Federal Circuit in *Best Lock*.

        In *Best Lock*, the appellant argued that since "an unlimited number of key

blade and corresponding keyway designs are available," the design claimed for the

key blade "is not dictated solely by functional concerns." *Id.* at 1566. A dissent by

Judge Newman agreed with the appellant's argument:

> The parties to this litigation agree that there are myriad possible designs
> of key profiles. All keys require, of course, mating keyways. In holding
> that because the key must fit a keyway, the abstract design of the key
> profile is converted to one solely of function, the court creates an
> exception to design patent subject matter. An arbitrary design of a
> useful article is not statutorily excluded from § 171 simply because in
> use it interacts with an article of complementary design.
> ….
> In sum, the fact that the key blade is the mate of a keyway does not
> convert the arbitrary key profile into a primarily functional design. It is
> not the design of the key profile that is functional, but the key itself.

*Id.* at 1569.  Unfortunately for the appellant in *Best Lock* and for FGTL in the

instant case, the Federal Circuit rejected this argument, explaining:

> Further, Best Lock's assertion that a variety of possible shapes of
> interfaces between keys and locks exists does not compel a different
> result.  Clearly,  different  interfaces  between  key  blades  and

---

[9]     FGTL also states "[g]iven this undisputed evidence and the failure for NWI
to identify any functionality defense in its Final Contentions (other than its
appearance as function change in the law), summary judgment is appropriate." (Doc.
99, p. 20).  The Court has extended the deadline for final contentions. (Doc. 98).

corresponding lock keyways can be designed to permit the combination to function as a lock and key set. However, Best Lock's patent does not claim the combination of a lock and corresponding key. Instead, the claim in the '636 design patent is limited to a key blade, which must be designed as shown in the '636 patent in order to perform its intended function.

*Id.* at 1566.  The Federal Circuit explained that although it may be permissible for Best Lock to patent the *combination* of a given key blade and keyway design (assuming all other patentability requirements were satisfied), it was not going to allow Best Lock to divide up the combination and have a design patent on just the key blade when a replacement key blade had to be designed as shown to make the combination function as a lock and key set.  The Federal Circuit's analysis did not focus on alternative designs that might be created before or during the design process, but rather focused on the mate and match compatibility issues after the designs were created.  The issue of whether the patented design was a "matter of concern" was determined by focusing on whether there was a need for the key blade design to mate and match with the keyway design after the designs had been created.

Applying the *Best Lock* analysis and policy considerations to the instant case, since the designs at issue cover portions of foreseeable repair/replacement parts as in *Best Lock* and *Static Control*, this Court should not allow FGTL to divide up the combination (vehicle) design and have design patents on just portions of the parts when the repair/replacement parts have to be designed a certain way to return the combination (vehicle) back to its original condition and appearance.  Just as the key

14

purchaser in *Best Lock* needed a key blade that would mate and match with the lock, the cartridge purchaser in *Static Control* needed a printer cartridge that would mate and match with the printer, so too does a purchaser in the instant case need parts that will mate and match with the vehicles and bring them back to their original appearance and condition.  Under the *Best Lock* analysis, FGTL's argument that it "could have employed a virtually unlimited number of alternative designs" must be rejected because the same argument was rejected in *Best Lock*.

Finally, FGTL provides evidence that other designs may be used to replace the patented parts (but not to bring the Vehicles back to their original appearance). As discussed above, this evidence is not relevant because these parts are not capable of bringing the Vehicles back to their original condition and appearance.

G.     *Rosco* and *Ethicon* Do Not Factually Apply to the Instant Case

FGTL argues that *Rosco, supra,* supports its argument that the claimed designs are not functional.   *Rosco*, however, does not involve mate and match principles and therefore is inapposite.  In *Rosco*, the Federal Circuit held a design patent on a bus mirror was not invalid as functional.  There was no evidence that the company selling the mirror was the same as, or was associated with, the company selling the bus.  The mirror mounted to the front fender of the bus and there was no evidence or discussion that the mirror was part of an overall integrated design of the bus, that the mirror was sold originally with the bus, or that any regulations, policies

of insurance, or other requirements mandated that the repair/replacement mirror had to be the same as the original if the bus was damaged.   Further, there was no discussion of a purchaser's desire or need to bring the bus back to the original condition after repair.   Therefore, the facts were different than in the instant case and the functionality factors discussed *supra* were neither present nor discussed.

FGTL also cites *Ethicon, supra*, but this case also is not applicable.   The design patents claimed designs of an ultrasonic surgical device.   There were no "mate and match" principles involved as there were in *Best Lock* and *Static Control*.

H.     The ALJ Order No. 12 is Neither Controlling nor Correct

FGTL relies upon ITC Order 12. (Ex. 8).   As explained in the ABPA Motion pages 11-14, the Order is neither controlling nor correct, it misapplies or misinterprets case law, and it is inconsistent with the analytical framework currently being used by courts to determine whether a patented design is invalid due to functionality in a mate and match context involving repair/replacement parts.

Finally, based on the cases and rationale set forth in ABPA Motion page 14, Defendants assert that patent invalidity due to functionality is an issue of law.

4.     Response to FGTL Argument on Patent Exhaustion

A.  FGTL's Legal Analysis is Incorrect

FGTL is mistaken that the doctrines of patent exhaustion and implied license do not provide an affirmative defense in this case. FGTL states "patent rights are

exhausted specifically and only to the patented product actually sold – there is no exhaustion as to any other product…." (Doc. 99, p. 21). Although that is true for utility patents, it is not true for design patents.[10] Under the statutory framework, a utility patent is tied to a specific machine or manufacture, but design patents are not. That is because design patents are directed to *designs for* an article of manufacture, which means the design patent can be directed toward only a *portion* of the design for an article of manufacture. This critical distinction forms the basis of Defendants' legal argument that patent exhaustion exists in this case.

B.     Patent Exhaustion Exists in This Case

The Vehicles are articles of manufacture sold in the United States. (Ex. 2, 3) FGTL has alleged that the subject patented designs are both applied to and are embodied in the Vehicles.[11] Therefore, the subject patented designs are exhausted by the first sale of the Vehicles. *See Jazz Photo Corp. v. Int'l Trade Comm.,* 264 F.3d 1094, 1105 (Fed. Cir. 2001); *Quanta Computer Inc. v. Lg Electronics, Inc.,* 553 U.S. 617, 638 (2008) ("If the thing that is sold 'substantially embodies' patented subject matter owned by the entity that authorized the sale, then the patent is exhausted as to the thing sold.").

---

[10] Patent exhaustion, right to repair, and implied license legal principles, together with relevant statutes and case law are set forth on pages 14-18 of ABPA Motion.

[11] This argument assumes *arguendo* that FGTL will be able to prove that the design patents are the same as or similar enough to the corresponding vehicle design areas that infringement may be proved under the ordinary observer test.

The Vehicles sometimes are involved in collisions and need repair. The process of repair often involves purchasing repair parts from third parties, such as ABPA members.  Since the subject patents are exhausted as to the thing sold, and the things sold are the Vehicles, purchasers of the Vehicles have an implied license to use the subject design patents.  *See McCoy v. Mitsuboshi Cutlery, Inc*., 67 F.3d 917, 921 (Fed. Cir. 1995).  This implied license includes the right to repair and return the Vehicles (article of manufacture) back to their original patented appearance.  *See Kendall Co. v. Progressive Medical Technology, Inc.,* 85 F.3d 1570, 1573 (Fed. Cir. 1996).  If the repair and return to the original patented appearance requires the purchase of repair parts, then this is permitted under the implied license.  *Id.*  That is because the focus is not on the repair parts themselves, but rather on the article of manufacture that needs repair.  *Id.*  (The "implied license to use include[s] the right to repair the patented article and necessarily to purchase repair parts from others.").

The repair that occurs to the Vehicles is not prohibited reconstruction because the repair of the Vehicles does not "construct an essentially new article on the template of the original."  *Jazz Photo*, 264 F.3d at 1102.  (Ex. 7, p. 2, ¶7).  Indeed, if the damage to the Vehicles is so extensive that essentially a new vehicle has to be constructed, the Vehicles will not be repaired.  (Ex. 7, p. 2, ¶7).  That is because the cost of the reconstruction will greatly exceed the cost of purchasing a new vehicle. (Ex. 7, p. 2, ¶7).

18

Since the owners of the Vehicles have an implied license to repair the Vehicles, the owners also have "have made" rights that shield the manufacture of the repair parts and all members of the distribution chain from liability for patent infringement. *See CoreBrace LLC v. Star Seismic LLC,* 566 F.3d 1069, 1072-73 (Fed. Cir. 2009); *Intel Corp. v. Broadcom Corp.,* 173 F. Supp. 2d 201, 232 (D. Del. 2001) ("[B]y exercising their rights to 'have [licensed products] made,' licensees can shield the unlicensed manufacturer who makes the products for them and subsequently sells the products to them from infringement liability by impliedly licensing the otherwise infringing actions.").

C.     The ITC Order 7 is neither Controlling nor Correct

In *In re Certain Automotive Parts*, 337-TA-557ITC, Order No. 7 struck the affirmative defenses of patent exhaustion and implied license based on the same reasoning that FGTL makes in its motion for summary judgment.  This Order is neither controlling (*see Powertech Technology Inc. v. Tessera, Inc*., 660 F.3d 1301, 1308 (Fed. Cir. 2011) nor correct, and the Order contains at least two fundamental mistakes of law.  First, the Order does not properly distinguish between 35 U.S.C. § 101 (utility patent) rights that claim the *actual* "machine" or "manufacture," and 35 U.S.C. § 171 (design patent) rights that claim a "design *for* an article of manufacture." (emphasis added).  The distinction is critical, and by failing to make it, the order makes the same type of mistake the Board made in *In re Zahn,* 617 F.2d

261 (C.C.P.A. 1980) that led to a reversal of the case. Second, regarding the implied licensing rights from patent exhaustion, the ITC failed to apply the legal principle that the repair and "have made" rights of Vehicle purchasers protect the manufacturer of repair parts and others in the distribution chain.

1.      Patent Exhaustion and Permissible Repair

The administrative law judge concluded the section on patent exhaustion and repair stating "[t]he administrative law judge perceives no effective difference between whether the component of a patented article is covered by a design patent or a utility patent." (Ex. 9, p. 9). This perception is incorrect. In utility patents, the claim or claims cover the *actual* machine or article of manufacture. In a design patent, however, the claims do not cover the actual machine or article of manufacture. Rather, the claims cover *a design for* an article of manufacture. This critical distinction led the court in *In re Zahn, supra,* to conclude that a patent could be granted for a design that was *less than* the entire article of manufacture.

35 U.S.C. § 171(a) states "whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." Under the patent exhaustion doctrine, the sale of a "patented article" exhausts the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold. *Jazz Photo,* 264 F.3d at 1105. Since the design for an article of manufacture may be less than

20

the design for an entire article of manufacture, the "patented article" sold for purposes of the patent exhaustion doctrine is properly any article of manufacture containing the patented design as part of its overall design.  In the instant case, the Vehicles designs contain the designs claimed in the subject patents.  Therefore, for purposes of the patent exhaustion doctrine, it is the Vehicles that are the articles of manufacture that can be repaired using any patents exhausted by the first sale of the Vehicles, including the subject patents.[12]

The ALJ relied heavily on *Aiken v. Manchester Print Works*, 1 F. Cas 245 (1865).  According to the ALJ, "[i]n that case the Court determined that because the needles of a knitting machine had been separately patented, the purchase of the knitting machine did not confer upon the purchaser a right also to manufacture replacement needles."  (Ex. 9, p. 7).  The ALJ stated further that although "there are a number of ways to distinguish *Aiken* from the present situation, there is a critical commonality: *Aiken* addressed a situation where a piece of a patented article itself is also patented which is key to issues in the pending motions."  (Ex. 9, p. 9).  The general rule relied on by the ALJ is that an article of manufacture may not be permissibly repaired under the patent exhaustion doctrine by replacing an article of manufacture patented separately from the article of manufacture being repaired.  The

---

[12]    Under similar reasoning, method patents also have been held exhausted upon the sale of the article.  *See Static Control, supra*, 487 F. Supp. 2d at 856.

critical flaw in the ALJ's reasoning is that this general rule, applicable to utility patents, does not apply to design patents under the circumstances of the instant case.

Under the general rule cited, the patent covering the separate component article of manufacture being replaced (needle) is different from the patent that covers the article of manufacture being repaired (knitting machine). That is because under § 101, a utility patent is directed toward the actual machine or article of manufacture invented. Although a sale of the machine and needle together exhausts both patents, the patent exhaustion doctrine only permits repair and not replacement. Since the patents and articles of manufacture are different, they must be analyzed separately to determine whether repair or replacement is occurring for each. Permissible repair of the machine does not necessarily mean permissible repair of the needle. If permissible repair of the needles is not occurring, and the needles are being replaced instead as in *Aiken*, then patent infringement of the needle patent may exist and the affirmative defense of patent exhaustion is not available.

The situation is different with a design patent under the circumstances of the instant case. First, there are not two separate patents involved as in *Aiken*. Rather, there is just one design patent to consider. Second, when the one subject patented design is placed on or in the article of manufacture sold (the Vehicles), the one design patent is exhausted. And as long as it is the Vehicles that are being permissible repaired, then the patent exhaustion doctrine allows use of the subject

patented design (originally a part of the Vehicles that were sold) to repair the Vehicles that were sold with the patented design. This is to be distinguished from the situation in *Aiken* where the court had to go through a separate repair/ reconstruction analysis with regard to the needle itself because the needle was covered by a separate patent directed only toward the needle.

There is no need to perform a separate repair/reconstruction analysis on the repair parts in the instant case because the patented design covering a portion of the repair parts is the same as the patented design covering a portion of the article being permissibly repaired. There is no reason that the repair permitted for the Vehicles should be canceled or nullified simply because the patentee chose to divide the original article of manufacture up into separate component parts that have the same design portions as contained in the original article of manufacture sold.

2.      The "have made" rights of F-150 Truck purchasers protect the manufacturer of repair parts and others in the distribution chain.

The ALJ found that the "respondents here cannot stand in the shoes of a 'purchaser' because they produce or distribute new versions of replacement parts for sale that compete with Ford parts rather than repairing parts that were originally purchased from Ford." (Ex. 9, p. 8). As discussed above, that analysis is incorrect because, *inter alia*, it ignores that the articles of manufacture containing the patented designs that were purchased and needed repair are the Vehicles. Since the implied license covers the right to repair the vehicles, the "have made" rights of the vehicle

23

purchaser protects the manufacturers and distributors, including ABPA members, from liability for patent infringement. *See CoreBrace LLC, supra,* at 1072-73.

FGTL argues that the patent exhaustion doctrine can never be applied upstream to protect accused infringers. That is not true when the doctrine of repair comes into play. FGTL cites *Asetek Holdings, Inc. v. CoolIT Sys., Inc*., 2013 WL 5640905 at *2 (N.D. Cal. Oct. 11, 2013), but this case is not applicable because *Asetek* did not involve repair parts being sold to repair a product where patent rights had been exhausted after a first sale. FGTL also cites *Intel Corp. v. Broadcom Corp.*, 173 F.Supp.2d 201 (D. Del. 2001), but that case did not involve the right to repair or an implied license arising out of the right to repair, so *Intel* is not applicable. As explained above, when the doctrine of repair applies, the owner of a vehicle has an implied license to repair the vehicle and the owner also has "have made" rights that shields the manufacture of the repair part and all members of the distribution chain from liability for patent infringement. The cases cited by FGTL do not involve the doctrine of repair and therefore are not applicable to this case.

D.    Defendants have Provided Evidence of Patent Exhaustion

FGTL argues that Defendants have not provided supporting evidence for patent exhaustion, but that is not correct. CSMF 1 states "Ford Motor Company (hereinafter "Ford") is a manufacturer and seller of, *inter alia*, automobiles and automotive parts. (Ex. 1, ¶17). Ford designed, manufactured, and sold the F-150

24

Pickup Truck and Ford Mustang (Vehicles) in the United States. (Ex. 2, 3)." CSMF 9 states "[v]ehicle repair parts such as a Ford F-150 hood and head lamp ultimately are sold to, and the repairs are performed on behalf of, the owner of the Ford vehicle being repaired. (Ex. 6, p. 1)." Patricia Zimmerman in Ex. 6 further states "[b]y owner of the vehicle, I mean a person or entity that (i) has purchased or is purchasing the Ford vehicle from a Ford dealership, or (ii) a person who has purchased the Ford vehicle from a person or entity who is in the proper chain of ownership that began with Ford and a Ford dealership" and "I do not recall a single time that repairs were performed for and the repair parts were purchased for some person or entity that was not the owner of the vehicle being repaired." These facts provide evidence to establish the factual predicate for patent exhaustion in this case.

5.    CONCLUSION

Based on the foregoing argument and authorities, ABPA respectfully requests that this Court deny FGTL's motion for summary judgment.

Respectfully submitted,

/s/ Robert G. Oake, Jr.                    /s/ Paul M. Kittinger
Robert G. Oake, Jr.                         Paul M. Kittinger (P72754)
Texas State Bar No. 15154300         CARDELLI LANFEAR, P.C.
Oake Law Office                             322 W. Lincoln
825 Market Street, Suite 250           Royal Oak, MI 48067
Allen, Texas 75013                          (248) 544-1100
(214) 207-9066                              pkittinger@cardellilaw.com
rgo@oake.com

Attorney for Defendants                   Attorney for Defendants

25

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

I hereby certify that on March 3, 2017, I electronically filed the foregoing Document with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System: None.

/s/ Robert G. Oake, Jr.
Attorney for Defendants
Texas State Bar No. 15154300
Oake Law Office
825 Market Street, Suite 250,
Allen, Texas 75013
(214) 207-9066, rgo@oake.com
Attorney for Defendants